# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# WESTERN DIVISION

| Timothy Shane Hamel | ) | |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | No. 16 CV 50194 |
| | ) | Magistrate Judge Iain D. Johnston |
| Nancy A. Berryhill, Acting Commissioner of Social Security,[1] | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Timothy Shane Hamel was in the Marines from 1988 until 1992, and spent seven months in combat in the First Gulf War. While there, as he would later tell a doctor, he saw "dead men, women & children" and "survived many IED, RPG, Mortar attacks." R. 988. This experience led to post-traumatic stress disorder ("PTSD"), a condition he has suffered from, in varying degrees, since then. This ailment is the primary basis for claiming Social Security disability benefits now.

This simple A-causes-B narrative is complicated by plaintiff's post-military work record. For many years, he was able to work full-time despite his PTSD, with his longest stint being a flight attendant for United Airlines. This job required him to work in close quarters and interact with diverse people. Plaintiff eventually quit this job because he was missing too many days. After working a series of other jobs, plaintiff applied for disability benefits from the Veterans Administration ("VA"). In early 2010, a VA doctor concluded that plaintiff was 100% disabled based on his flashbacks of "dead bodies [he] saw littering the streets in the Gulf War," his hypervigilance, and his poor concentration. R. 305. Plaintiff began receiving a monthly payment of $2,673. R. 298.

---

[1] Nancy A. Berryhill has been substituted for Carolyn W. Colvin. Fed. R. Civ. P. 25(d).

After this time, which was his low point, plaintiff began to improve somewhat. Various theories, discussed below, have been offered to explain the improvement. In August 2013, over three years after the VA's determination, plaintiff applied for Social Security disability benefits, alleging that mental and physical problems still prevented him from working. One of his main arguments for being found disabled by the SSA was that the VA had already done so. After two hearings, an administrative law judge ("ALJ") found that plaintiff could work full-time subject to restrictions designed to accommodate his PTSD. Disagreeing with this decision, plaintiff filed this appeal. Everyone agrees that plaintiff has PTSD and that it causes problems from time to time. The nub of the dispute is how much plaintiff improved after 2010 and specifically whether this improvement would last if plaintiff went back to work. Numerous medical experts over the course of this case have grappled with this core question.

**BACKGROUND**

At the first hearing, held in early 2015, plaintiff's attorney gave an opening statement laying out plaintiff's theories and also indirectly revealing a few weak points in his case. Counsel began by stating that it was "notable" that the VA "deemed that this gentleman was entitled to service-connected disability." R. 80. Although acknowledging that the VA "utilizes a different standard," counsel argued that the VA doctors were "uniquely suited and trained to deal with" PTSD. *Id.* Counsel then offered a second cause for plaintiff's PTSD, which was the 9/11 terrorist attack. Counsel explained as follows:

> [T]here was [a] secondary exacerbating factor that did emerge subsequent, when the Claimant did attempt to rejoin society among other things. He attempted to be a flight attendant, and he did that for several years. In this case he had the unfortunate set of coincidences whereby he requested a transfer off of a route that he'd been on for eight years, recently getting that transfer, and then very shortly thereafter September 11th, 2001, the very route that he'd been on for many years, was the route that was the second plane that hit the Twin Towers. We don't offer that gratuitously. We don't offer that for anything other than that that's something that

> he has noted and he has what seems to be some substantial amount of survivor's guilt as a result of.

R. 81. Counsel explained that, after working a series of jobs, plaintiff filed for VA benefits and then engaged in "a regular therapy regime." R. 82. Counsel offered several other "exacerbating factors," including plaintiff's divorce from his first wife and "substantial amounts of domestic strife" with his second wife and her daughter. Counsel finally offered yet another factor, stating that the flashbacks had "become more pronounced in recent months with the protracted increase in the strife and violence that we see in the Middle East." R. 83. Overall, counsel described the 20-year period as a "pretty clear trajectory," a story "that makes a lot of sense."[2]

Dr. Kathleen O'Brien, a clinical psychologist, then testified as the impartial medical expert. R. 190. She stated that plaintiff, after receiving VA benefits, "did struggle a good deal with the PTSD" for four or five months, but that his mental status eventually improved by August 2010. R. 85. She stated that he had "some issues of non-compliance with treatment," but overall had only mild limitations in activities of daily living, moderate limitations in social functioning, and mild limitations in concentration. *Id.* Plaintiff's counsel cross-examined Dr. O'Brien at some length. Dr. O'Brien stated that she had worked with war veterans who had PTSD and acknowledged that symptoms can wax and wane. She observed that, even though plaintiff had some family difficulties in the last two years, she did not see anything that "would suggest that the decompensation would occur simply because he was in a setting where he was doing simple tasks." R. 87. Counsel asked what was "missing" to find plaintiff disabled, and Dr. O'Brien stated as follows:

> We should expect to see that he would have participated in an intense kind of group therapy, which is in many ways the gold standard of treatment for PTSD. He was enrolled in March 2010 in such group. He attended once and then stopped attending

---

[2] Counsel also briefly mentioned a few physical issues—a tremor, gastrointestinal issues, and having "gained perhaps 130 pounds since he left the service." R. 83.

because he reported that he was working. There's no evidence that he ever picked
up again and did this. He could be in an intensive outpatient program where he
worked with other veterans again on issues [] of readjustment into the environment.
I would expect to see much more intensive records of ongoing contact that was
addressing the severity that you're alluding to.

R.87.[3]

Plaintiff then testified. The ALJ asked why he stopped working. Plaintiff answered as follows: "I was finding it hard to deal with certain situations. As a flight attendant I stopped because I just couldn't deal with the fact that, you know, I just lost my friends and it was just very irritating to me." R. 89. However, the ALJ then noted that plaintiff only quit the flight attendant job in 2003 (*i.e.* he continued to work after the 9/11 incident), and plaintiff responded vaguely as follows: "Yes, but if you need to go back and reflect, I am not hirable by United Airlines due to my attendance." R. 90. Plaintiff then described his jobs after United Airlines. One was an assembly line job, but attendance "was a big problem because [he] would [] get really sick," and he also had "battles" with a coworker. Plaintiff stated that he would "get chest pains" and "throw up" and that he had "bouts of depression." R. 91. Another job was as a delivery driver. This job was short-lived because plaintiff and the manager were "butting heads quite a bit." *Id.* Plaintiff attributed these problems to the fact that "[t]here's still so much of the Marine in [him] that it's hard to make that transition between military and civilian." R. 92.

The ALJ then asked plaintiff to respond to the assertion that his records show that "things are pretty stable." R. 94. Plaintiff answered that he still had "day-to-day battles" and only left the house two to three times a week and those trips were "basically just to run to the grocery store." R. 94-95. The ALJ asked why he "didn't always go" to therapy, and plaintiff stated that he was

---

[3] A second medical expert, Dr. Leonard Rubin, was then called but the ALJ did not take his testimony because he had not received the relevant medical records. Dr. Rubin later submitted a written statement, opining (among other things) that plaintiff "should be able to perform low-stress meaningful work." R. 1232 (emphasis in original).

4

"making every excuse not to go." R. 96. Asked what triggered PTSD symptoms, he identified the smell of oil from road construction, fireworks, and crowds. R. 97.

Plaintiff's wife testified that she and plaintiff had been married since July 6, 2002 and that things seemed "good in the beginning." Plaintiff was then working for United Airlines and would call in sick each month because of fatigue and vomiting which she thought was from acid reflux. She stated that he sometimes yelled. R. 104 ("When he's frustrated or having mood swings [] he'll just yell, and he's angry, and it kind of just doesn't matter what you do, [you] don't want to be in the line of fire."). She described an incident when he got in a yelling match in the checkout line at a Walmart while shopping during the Christmas season. When asked why plaintiff did not always go to therapy, she referred vaguely to "pivotal points in [their] marriage" which they did not "like to talk about much." R. 107. She stated that plaintiff sometimes was irritated with therapists but noted that he had been seeing a therapist named Mike since 2010 and that they had "quite a strong bond." R. 109.

Apparently not satisfied with the first hearing, the ALJ called a second one, which took place six months later. Plaintiff was again represented by counsel, albeit a different attorney. This attorney also made an opening statement, stating that the "theory here remains that [plaintiff] is totally and permanently disabled due to [PTSD] related to his time in combat." R. 46. Counsel again emphasized the VA's earlier decision. Counsel anticipated that his client might come off as "very pleasant, very articulate" and could "explain things well" but argued that, like many people with PTSD, he has "his triggers." *Id.* Counsel acknowledged that Dr. O'Brien had opined that plaintiff improved after 2010. *Id.* ("I understand some of the testimony from the experts at the last hearing that there was a notion of this improvement and that things were going relatively well for him."). Counsel then offered the following explanation:

5

> Your Honor, our position is that [the improvement is] because Mr. Hamel is no longer in a situation where he's in unfamiliar like workplace dealing with stressors. He's been able to confine himself as he needs to which is almost entirely at home. He doesn't maintain hypervigilance. He'll explain today that he has bells affixed to the doorknobs in the house so he can hear if someone is coming in. He does still have great struggles with startle response and whether he's awake or sleeping, if someone comes in and he's not expected it, he's bound to try to strike someone. He's securing his perimeter when he's at home. [] But really what this comes [to] is his ability to sustain in the workplace setting. Even with minimal stress, we believe that he would be triggered in a way that he could not be vocationally reliable without having interference from his symptoms.

R. 46-47.

Dr. Michael Cremerius testified as an impartial medical expert. After reviewing the evidence, he opined that plaintiff could work certain jobs. As discussed below, plaintiff's counsel cross-examined Dr. Cremerius at some length and tried to get him to agree that plaintiff would decompensate if he returned to full-time work.[4]

On January 15, 2016, the ALJ found that plaintiff had the residual functional capacity ("RFC") to do light work subject to certain restrictions, including the following: "The claimant could understand, remember, and carry out simple instructions and perform simple tasks and occasionally interact with the public, co-workers, and supervisors." R. 27.

## DISCUSSION

Plaintiff raises four major arguments for remand. The first two are the most extensive while the final two are briefer, focusing on targeted aspects of the ALJ's decision.

**I.      Medical Opinions.**

Plaintiff argues that the ALJ failed to credit the opinions of four doctors, one who was a treating doctor (Dr. Cherian) and the other three who were consultants or testifying experts (Dr. Benton, Dr. Gilliland, and Dr. Cremerius). Before addressing the specific criticisms directed at them, two preliminary points should be noted. First, the ALJ had to reconcile numerous opinions,

---

[4] Dr. Jilhewar testified about plaintiff's physical ailments.

not just the four plaintiff has chosen to focus on. These included Dr. Mark Langgut, Kristen M. Wright, Dr. Rubin, Dr. Jilhewar, and Dr. Gotanco. Although not uncommon in disability cases, it is still worth noting that it is not always an easy task to come up with a unifying thesis to reconcile such an array of opinions—many with differing levels of specificity and terminology—all given over a multi-year period. Whichever way the ALJ ruled, he necessarily would have had to discount some opinions.[5]

Second, plaintiff has raised the general argument that the ALJ failed to follow the treating physician rule by, among other things, not applying the six checklist factors. This Court takes the view that ALJs must explicitly apply the checklist, and the ALJ did not do so here. However, this Court has held, in limited instances, that the failure to do so could be harmless error. *See, e.g.*, *Duran v. Colvin*, 2015 WL 4640877, *10 (N.D. Ill. Aug. 4, 2015) ("the Court chooses to *sua sponte* invoke the harmless error doctrine" because the "Court is confident that remand on this issue is not necessary."). This Court finds this to be such a case. The ALJ analyzed the medical opinions at some length, providing multiple rationales. Moreover, any failure to provide more explanation is harmless error in light of all the facts of this case.

**A. Dr. Benton.** Plaintiff complains that the ALJ wrongly gave Dr. Benton's opinion little weight. He was the VA doctor who found plaintiff was 100% disabled. The ALJ gave two reasons for discounting this opinion. The first is that the VA decision is based on "different requirements and criteria." R. 30. Plaintiff acknowledges that this is an accurate statement.[6] At the same time, plaintiff's counsel at the hearings emphasized the VA's decision as a reason to find plaintiff disabled. But the difficulty with plaintiff's recurring mention of this fact is that

---

[5] It should also be noted that plaintiff has never suggested that a new medical expert should be called on remand to resolve any discrepancies.
[6] This point was echoed by Dr. Cremerius who testified that "somebody who has PTSD and is considered 100 percent disabled" by the VA would not necessarily be disabled under the Social Security regulations because "it's not the same criteria." R. 50.

7

plaintiff has not offered any reasonable way to "translate" the VA finding into the SSA framework. Accordingly, other than acknowledging the VA finding, which the ALJ here did, this argument essentially hits a dead-end. In sum, the ALJ's first rationale is more of a defensive explanation; it is not a valid basis by itself for rejecting the opinion.

However, this leads to the ALJ's second and primary rationale, which is that Dr. Benton's assessment was of limited relevance because it was rendered in January 2010 before plaintiff began receiving therapy and started improving. In his opening brief, plaintiff acknowledged that there was "some improvement" after 2010. Dkt. #14 at 12. Plaintiff also noted that Dr. Benton assessed plaintiff's GAF score at 30 in January 2010 and that later doctors, including Dr. Cherian, rated his GAF much higher. At the second hearing, plaintiff's counsel acknowledged Dr. O'Brien's testimony that plaintiff had improved and then, rather than challenging that premise, offered an explanation—actually two. The main one, set forth in the opening statement, was that plaintiff was no longer working full-time. The other one, which was suggested in a question put to Dr. O'Brien, was a catharsis theory that posited that the VA's award of benefits alleviated plaintiff's stress. *See* R. 86 (plaintiff "had the further benefits of the catharsis that comes with having the VA acknowledge his [PTSD]," thus providing him with "some measure of stability"). Dr. Benton was not able to evaluate either of these theories.

It is true that the ALJ did not apply the checklist. However, it is not clear that a more rigorous application would have changed the ALJ's mind. As noted above, Dr. Benton's opinion differed from later doctors who opined that plaintiff's symptoms were not as severe. Translated into the checklist, this argument relates to the length of treatment (factor #1) and the supportability and consistency of the opinion (factors #3 and #4).

**B. Dr. Cherian.** He offered two opinions. The first was three-page Mental Impairment Questionnaire completed in April, 2014. The second was a letter dated March 18, 2015. It appears that he acted more as a medication oversight psychiatrist rather than as a therapist. The ALJ gave Dr. Cherian's two opinions "some limited weight," noting that no "concrete examples" were given to support the conclusion, that the objective clinical evidence did not support wider limitations, and that Dr. Cherian's two opinions were "arguably inconsistent." R. 33. Plaintiff attacks these rationales, but the Court again finds that that they were a reasonable interpretation. To the extent that they were insufficient, any error was harmless.

The latter conclusion is based on the fact that Dr. Cherian's opinions were ambiguous on the bottom-line question. The ALJ alluded to this fact at the start of his analysis when he inserted the qualification that "to the extent that" Dr. Cherian's opinions supported plaintiff's claim not to be able to work, the ALJ disagreed with them. As for the 2014 questionnaire, it contains evidence both for and against plaintiff. For example, question number three lists 32 "signs and symptoms" that could be checked. Dr. Cherian checked only the following four: (i) "sleep disturbance," (ii) "decreased energy," (iii) "recurrent panic attacks," and (iv) "social withdrawal or isolation." R. 414. Not surprisingly, plaintiff emphasizes these four to argue that his condition was severe. But like the proverbial dog that didn't bark in the night, plaintiff does not mention the 28 items that were *not* checked off. They include symptoms one would expect to be checked if plaintiff's testimony were fully credited. These include "hostility and irritability," "difficulty thinking or concentrating," "mood disturbance," "generalized persistent anxiety," "paranoia or inappropriate suspiciousness," and "intrusive recollections of a traumatic experience." *Id.* Question number ten likewise provides a mixed bag. This question consists of a grid listing 17 mental skills with three columns labelled "mildly limited," "moderately limited," or "markedly

9

limited." R. 415. Of the eight skills that Dr. Cherian chose to address, he did not check *any* of them as being markedly limited for plaintiff. He found that four were moderately limited and three were mildly limited. Notably, several of these statements bear directly on key issues here. Most relevant, one stated as follows: "Complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent page without an unreasonable number and length of rest periods." R. 415. Dr. Cherian checked mild, the lowest category, for this statement. As for the four skills rated as moderately limited, most of them related to interacting with others, which was accounted for in the RFC formulation.

The 2015 letter is similarly vague. It states as follows:

> The above patient had been under the care of a psychiatrist with the VA program since January 10, 2010 and under my care since 2013 [] for the treatment of PTSD. He is attending Counseling Sessions with Mike Pollard in this clinic. He is fairly well controlled on medication. He had been determined to be disabled by VA 100%. He is being treated with Sertraline to control his temper [] and had not been working for the past 5 years on a full time basis. It is likely that the stresses of full time employment may aggravate his PTSD. This condition is expect[ed] to last several years.

R. 2022. As the ALJ noted, the letter contains no specific examples and little detail. Moreover, what information is included is again equivocal. For example, Dr. Cherian states that plaintiff is "well controlled on medication." This statement supports the ALJ's general thesis regarding improvement. As for the bottom-line opinion, the ALJ reasonably could have viewed it as a tentative ("likely" and "may") and therefore only a lukewarm assessment.

The ALJ questioned Dr. Cherian's opinion that plaintiff had one to two episodes of decompensation. As the ALJ noted, Dr. O'Brien opined that plaintiff did not decompensate even though he "endured marital and parenting stressors." R. 33. Insofar as this Court can tell, no other expert opined that plaintiff experienced an episode of decompensation. In sum, contrary to plaintiff's suggestion that Dr. Cherian found plaintiff completely unemployable, these two

10

opinions never reach any such definitive conclusion and, in fact, contain some evidence supporting the ALJ's theory.

**C. Dr. Cremerius.** Plaintiff raises two brief criticisms about this testimony. First, plaintiff argues that the ALJ failed to explicitly assign any weight to this opinion. Second, plaintiff claims that the ALJ failed to address an inconsistency in his testimony. The Court finds that neither argument is a basis for a remand. As for the first point, it is true that the ALJ did not specifically state how much weight he gave to Dr. Cremerius's testimony. However, this appears to be an oversight. The ALJ referred to this testimony in several places, and it was the central focus of the second hearing. Importantly, this testimony bolstered the ALJ's decision. Therefore, any failure to discuss it in greater detail is harmless error.

Plaintiff's second argument focuses on the fact that, at several points, Dr. Cremerius acknowledge that it was "conceivable" plaintiff would decompensate if he went back to work. The Court has read the transcript and does not find any inconsistency. It is true that, in response to repeated questioning from plaintiff's counsel, Dr. Cremerius conceded this point. But in each instance, he made clear that his opinion still remained that plaintiff would *not* decompensate. For example, he stated that "the record really, really doesn't' show" that plaintiff's allegations were credible. R. 71. His references to the *possibility* plaintiff could decompensate were simply a truthful acknowledgement that any prediction about a claimant's future condition could, *in theory*, turn out to be wrong.

**D. Dr. Gilliland.** Plaintiff also complains that the ALJ ignored the opinion of Dr. Gilliland, a State agency doctor. The Government agrees that the ALJ failed to address this opinion, but argues the failure to do so is harmless error. Dr. Gilliland opined that plaintiff was "mentally capable of performing semi-skilled tasks in a routine schedule with reasonable rests

11

periods, limited interaction with general public and coworkers, *and reasonable encouragement from supervisors*." R. 144 (emphasis added). Plaintiff focuses on the italicized portion, asserting that it should have been explicitly included in the RFC. This Court is not persuaded.

This limitation was raised at the first hearing when plaintiff's counsel asked the vocational expert about it. The ALJ seemed unsure how counsel was defining "reasonable encouragement." Plaintiff's counsel offered the following definition embedded in a question:

> Q  If in the context of a interaction between a coworker and a supervisor that supervisor is expected to preface *all* criticism and redirection with we think you're doing a *wonderful* job, we think you're doing a good job, *we like you*, but; in other words, if someone is *forced* to preface *every bit* of criticism or redirection with a complement or encouraging preface, is that something we *tend to see* in *competitive employment*? [ ]
>
> VE:  Okay. No, that's not *typically*, that would be considered an accommodation.

R. 120 (emphasis added). But this widely-framed question rests on counsel's expansive definition of encouragement, one not based on any objective criteria insofar as this Court can tell. It is not surprising that the vocational expert found such a Pollyannish supervisor to be unlikely. Aside from Dr. Gilliland's statement, the rest of the medical record contains little evidence to suggest that plaintiff needed this level of constant praise, or that the supervisors on the specific jobs the vocational expert found that plaintiff could do would be unwilling to provide some encouragement. Accordingly, the Court finds no error.

**II.      Credibility.**

Plaintiff attacks the ALJ's credibility finding on several fronts. Plaintiff argues that the ALJ relied too much on his activities, failed to properly credit statements from his wife, and failed to explore why he was non-compliant with treatment.

**A.  Activities.** Plaintiff argues that the ALJ relied on bare-bones set of facts about his daily activities that included no details about the nature and frequency of these activities. The

12

activities included part-time farming, remodeling, travelling to Florida, and going on camping trips, as well as other more typical activities such as handling finances, eating in restaurants with his wife on a regular basis, and mowing the lawn. Plaintiff's argument is a recurring one in disability cases and requires a line-drawing judgment about whether the ALJ placed too much weight on this one type of evidence. Based on the sheer number of times the ALJ mentioned these activities, it is undeniable that he found them significant. But the Court does not find that the ALJ crossed the line in doing so.

First, as for claim that there were no details about these activities, this is not entirely correct. The ALJ referred to *some* details. For example, the ALJ noted that plaintiff had been "shoveling dirt" (it's unclear whether this was the farm work, remodeling, or something else); that he was "out mowing or raking the lawn"; that he was doing several home remodeling projects; and that he rated himself as having "good endurance for labor." R. 28-29. Second, the mere fact that plaintiff engaged in certain activities could be evidence by itself of *some* capabilities. Consider camping. By definition, the ALJ could reasonably infer that it required leaving the house and engaging in some planning and concentration. Similar inferences can be made about doing multiple home remodeling projects at once. Third, contrary to plaintiff's suggestion, the ALJ did not simply jump from the fact that plaintiff was doing these activities to the bottom-line conclusion that he could work full-time. Instead, in many instances, the ALJ cited these activities to address lower-level propositions. For example, the ALJ noted that these activities showed that plaintiff was "fairly physically active," that he had social interactions (*e.g.* working alongside the neighbor farming), that he was willing to "go out in a public setting" (*e.g.* camping, travelling, shopping, eating in restaurants), that his thought processes were coherent (*e.g.* handling finances and doing several home remodeling projects). R. 25-26. Another reason

for citing to these activities was that they contradicted portions of plaintiff's testimony. As the Government notes, the fact that plaintiff was doing farm work "directly and materially" undermined his allegation that he only left his home two to three times a week to go grocery shopping. Dkt. #20 at 13. Fourth, and importantly, the medical experts relied on these same descriptions in rendering their opinions. As the Government notes, "Dr. Cremerius specifically noted Plaintiff's farming activities when explaining why he thought Plaintiff [was] unlikely to decompensate under stress." *Id.* at 12. Likewise, Dr. Gilliland's report referred to plaintiff's "demonstrated capacity for completing routine tasks, such as personal care, simple meal preparation, household chores, shopping, and independent travel." R. 139.

**B. The Wife.** She provided both a written statement (Ex. 3E) and testified. As plaintiff recognizes, the ALJ did not ignore this evidence. *See* R. 33-34. Plaintiff argues, however, that the ALJ failed to assess *all* of this evidence. In his opening brief, plaintiff cited to only one statement the ALJ supposedly overlooked. This was the wife's assertion that she tried "to keep him somewhat scheduled." R. 340. Although the ALJ did not mention this one statement, it is vague and not inconsistent with the ALJ's conclusion limiting plaintiff to simple work tasks.

Moreover, like Dr. Gilliland and Dr. Cherian, plaintiff's wife made some statements supporting the ALJ's decision. For example, she noted that he engaged in various tasks around the house, such as cooking, doing laundry, and taking care of the dogs and did other more atypical activities such as camping and playing the drums. As for her testimony, she mentioned the Walmart incident as evidence that plaintiff had trouble interacting with other people. At the same time, this was the only such incident she mentioned and she explained that it was likely caused by the "poor choice" of shopping during the crowded Christmas season and that she and

plaintiff normally avoided such problems by shopping during the week when it was "very quiet." R. 105. This testimony, therefore, was not inconsistent with the ALJ's decision.

    **C. Inconsistent Treatment.** Plaintiff complains that the ALJ faulted plaintiff for not sometimes following through with treatment (*e.g.* failing to refill prescriptions or attend counseling) but then did not explore possible explanations for these failures. *See generally Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014) (an ALJ should not "rely on an uninsured claimant's sparse treatment history to show that a condition was not serious without exploring why the treatment history was thin").

    The Court does not find that this argument justifies a remand. First, although the ALJ periodically referred to instances of inconsistent treatment, the ALJ did not rely on this as a major rationale. In fact, the ALJ's overarching thesis was the plaintiff *improved* by getting treatment. Second, plaintiff has not come forward with any explanation for why he failed in some instances to seek treatment. He has not alleged that he lacked insurance or had financial difficulties. Plaintiff's counsel at the two hearings never brought out any such facts. At the first hearing, Dr. O'Brien specifically mentioned inconsistent treatment. Yet, counsel did not follow-up and challenge this claim. Also at the first hearing, plaintiff's wife was asked why he did not attend counseling consistently and she provided a vague answer about unspecified "issues within [their] marriage." R. 107. Plaintiff similarly provided a vague answer to the ALJ's question about sometimes not going to therapy. *See Liskowitz v. Astrue*, 559 F.3d 736, 740 (7h Cir. 2009) (plaintiff bears burden to show that he is disabled). So, contrary to plaintiff's assertions, the issue was raised at the hearing. It is unlikely that additional questioning would have changed the analysis.

15

**III.     Concentration.**

Plaintiff's third argument is short, consisting of a single paragraph in the unnecessarily lengthy opening brief. Plaintiff argues that the ALJ found at Step Three that he had moderate limitations in concentration, but failed to adequately account for this limitation in the RFC formulation. In making this argument, plaintiff does not discuss the facts in any detail. There is only a brief reference to a page from Dr. Gilliland's report. Although it is true that Dr. Gilliland found that plaintiff had moderate limitations in concentration, he also stated elsewhere in this same report that these limitations related to the ability to carry out "detailed instructions" as opposed to "very short and simple instructions." R. 142. The ALJ included this specific limitation in the RFC. Plaintiff also references another phrase from Dr. Gilliland's report—plaintiff's alleged inability to concentrate for "extended periods"—but here again this issue appears in context to be tied to *detailed* tasks. At least this is a reasonable interpretation. For these reasons, the Court finds that the ALJ adequately accounted for this limitation.

**IV.     Fatigue.**

Plaintiff's final argument, like the third, is relatively short. Although plaintiff argues that the ALJ failed to account for a list of impairments, plaintiff focuses mainly on "frequent fatigue." However, the ALJ repeatedly acknowledged plaintiff's fatigue and limited him to light work to account for it. Plaintiff believes the ALJ should have gone further and limited him to sedentary work. But this is a judgment call. Moreover, as the Government points out, the ALJ and medical experts noted that plaintiff had engaged in "strenuous" activities such as "farming and digging." R. 34. The ALJ was permitted to rely on these and other facts in assessing this question. It is also worth noting that neither of plaintiff's counsel at the hearings emphasized fatigue in their lengthy opening statements.

Aside from fatigue, plaintiff only briefly mentions a few other physical ailments in a laundry-list sentence at the end of the 24-page opening brief. *See* Dkt. #14 at 24 ("[The ALJ] also did not adequately explain how he considered all of Mr. Hamel's physical impairments, which could [] each contribute to fatigue, including obesity, depression, insomnia, obstructive sleep apnea, testosterone insufficiency, anemia, and vitamin D insufficiency."). But this sentence is not followed by any analysis. Therefore, this "argument" does not change the basic analysis.

\*　　\*　　\*

Plaintiff has filed detailed and lengthy briefs raising numerous arguments attacking the ALJ's decision; in addition, at the two hearings, counsel gave extensive opening statements and then actively questioned witnesses to bring out facts favorable to plaintiff. This Court in turn has attempted to address these many arguments and has found, as discussed above, that they do not provide a basis, either individually or collectively, for a remand based on the specific Social Security tests. Viewed from a larger perspective, the ALJ's conclusion that plaintiff could return to work rests on a fairly simple set of propositions. Although plaintiff suffered from PTSD as a result of his war experiences in the early 1990s, he was still able to work full-time for many years thereafter, despite his PTSD.[7] His symptoms apparently worsened in 2009-10, but he was not receiving any counseling then. After receiving some treatment, his symptoms improved. Plaintiff's counsel at the administrative hearings recognized that this period of work was a weakness in his case, and offered several theories to overcome it. However, the ALJ was not persuaded by them and instead agreed with Dr. Cremerius (and others) that, even though plaintiff "probably" could not go back to being a flight attendant where he would have to work "all the time in a really closed area," plaintiff could still work less stressful jobs, ones not bringing him

---

[7] *See* Dkt. #14 at 20 ("Mr. Hamel endured fluctuations in his mental state *before*, during, and after the relevant period") (emphasis added).

into contact with his PTSD triggers. R. 52. This is one reasonable conclusion that could be drawn from the record. *Richardson v. Perales*, 402 U.S. 389, 399-401 (1971) (substantial evidence exists if there is enough relevant record evidence that would allow a reasonable mind to determine that the decision's conclusion is supportable). Accordingly, it is not one this Court may second-guess.

## CONCLUSION

For all the above reasons, plaintiff's motion for summary judgment is denied, the Government's motion is granted, and the ALJ's decision is affirmed.

Date: October 27, 2017        By: _____
                                  Iain D. Johnston
                                  United States Magistrate Judge